IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | CRIMINAL NO. 2:24-mj-211 |
| ) | |
| BRAD KENNETH SPAFFORD, ) | |
| ) | |
| Defendant. ) | |

**GOVERNMENT'S SUPPLEMENTAL MOTION FOR REVOCATION
OF RELEASE ORDER AND MEMORANDUM IN SUPPORT**

The United States of America, by and through its attorneys, Jessica D. Aber, United States Attorney for the Eastern District of Virginia, and E. Rebecca Gantt, Assistant United States Attorney, moves this Court to revoke the December 30, 2024, release order of defendant Brad Kenneth SPAFFORD pursuant to 18 U.S.C. § 3145(a)(1).

As explained below, the defendant poses an extreme danger to the community, which cannot be sufficiently mitigated by bond conditions. The defendant is charged via criminal complaint with unlawful possession of an unregistered short barrel rifle. During the execution of a search warrant at his home earlier this month, where the defendant lived with two young children, the Federal Bureau of Investigation (FBI) located not only the rifle but a stockpile of more than 150 homemade improvised explosive devices, assessed as pipe bombs. Some of these devices were marked "lethal." Most of the devices were found in a detached garage, where the FBI also found tools and manufacturing materials, including homemade fuses and pieces of PVC pipe. Several additional apparent pipe bombs were found in a backpack labeled "#nolivesmatter" in the home's bedroom, completely unsecured.

The defendant also acknowledged to keeping a jar in his freezer of HMTD, an explosive material that is so unstable it can be exploded merely as a result of friction of temperature changes. Agent found this jar found unsecured next to household food items with handwritten labeling marking it as "Dangerous" and "Do Not Touch."

The FBI also found a notebook in the defendant's home with extensive handwritten lists of explosives and apparent "recipes" for how to make explosive materials (including HMTD and C-4, a military grade explosive) and destructive devices (including grenades).

The defendant has used pictures of the President for target practice, expressed support for political assassinations, and recently sought qualifications in sniper-rifle shooting at a local range. His release poses an extreme danger to those he lives with, the general community, and also the pretrial officers who will be tasked with periodically inspecting his residence for firearms including dangerous and unstable explosives. The government therefore respectfully submits that the release order should be revoked because no conditions are sufficient to mitigate these dangers.

The release order is stayed pending resolution of the motion to revoke, which the government initially filed on December 30, 2024. ECF Nos. 18, 19, & 20. The instant filing is substantially similar to that initial filing, with some new information, citations and quotations from the transcript of the detention hearing, ECF No. 22, and a response to the arguments in the defendant's responsive filing, ECF No. 21.

PROCEDURAL HISTORY

On December 10, 2024, the defendant was charged by single-count criminal complaint with Possession of a Firearm in Violation of the National Firearms Act, in violation of 26 U.S.C. § 5861(d). ECF Nos. 3 & 4. The defendant was arrested on December 17, 2024, ECF No. 13, and had his initial appearance the following day. ECF No. 8. The Honorable United States Magistrate

Judge Robert J. Krask[1] granted the government's motion for temporary detention and set the detention hearing for December 23, 2024, and the preliminary hearing for January 3, 2025, at the defendant's request. *Id.* At the parties' joint request, the preliminary hearing was reset for December 30, 2024. On December 23, 2024, the defendant appeared before the Honorable United States Magistrate Judge Douglas E. Miller for the detention hearing, but waived immediate detention and requested that the detention hearing be delayed until December 30, 2024. ECF No. 15.

On December 30, 2024, the defendant appeared before the Honorable United States Magistrate Judge Lawrence R. Leonard for his preliminary and detention hearings. The transcript is attached hereto ("Tr."). Following testimony by Detective Rachelann Cardwell, a FBI Task Force Officer, and proffer by counsel, Judge Leonard found probable cause to support the complaint. Tr. 52. Regarding detention, the United States argued that that the defendant should be detained because he posed a serious risk to the community under 18 U.S.C. § 3142. Tr. 54–56. At the conclusion of the hearing, Judge Leonard denied the government's detention motion, while acknowledging having "this terrible concern that if I decide incorrectly, there could be a significant problem down the road." Tr. 63. He ultimately ordered the defendant released subject to conditions including electronic monitoring, a requirement to maintain employment, and release to a third party custodian, the defendant's mother. Tr. 63–65.

At the conclusion of the hearing, the government noted it intended to seek review and revocation of the order of release in the district court, and requested that the release order be stayed until the conclusion of that matter. Tr. 66; *see* 18 U.S.C. § 3145(a)(1). Judge Leonard orally indicated he would grant the stay request upon the government's filing later that day. Tr. 66–67.

---

[1] The government's initial motion incorrectly stated the Honorable United States Magistrate Judge Douglas E. Miller presided over the initial appearance.

The government filed a motion to stay and motion to revoke the release order, ECF Nos. 18 & 19, and Judge Leonard entered an order staying the release order until the resolution of the government's motion for revocation. ECF No. 20.

## ARGUMENT

### 1. Legal Standard and Scope of Review

Whether to release a defendant on bond requires an examination of the factors set forth by Congress in Title 18, United States Code, Section 3142(g), including (1) the nature and circumstances of the offense charged, "including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, *firearm, explosive, or destructive device*" (emphasis added); (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger that would be posed to the community by the defendant's release. The defendant shall be detained if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Here, given the defendant's longstanding ties to the community and the availability of conditions including electronic monitoring and surrender of his passport, the government is relying exclusively on the defendant's dangerousness, which it must demonstrate by clear and convincing evidence. 18 U.S.C. § 3142(f).

The district court's review of a magistrate judge's release order is *de novo*, and the district court "must make an independent determination of the proper pretrial detention or conditions of release." *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001). The rules of evidence do not apply at a pretrial detention hearing, however, and the district court need not re-hear evidence previously presented before the Magistrate Judge. 18 U.S.C. § 3142(f); *United States v. Martin*,

447 F. Supp. 3d 399, 402–03 (D. Md. 2020) (noting it is within the district court's discretion whether to hold a hearing or rule on the filings). Accordingly, it is permissible for the parties to introduce a transcript of the hearing conducted by the Magistrate Judge and then, if desired, supplement that transcript with additional evidence and/or proffer.

    *2. Evidence & Proffer*

In early 2023, a confidential human source (CHS), who was the defendant's neighbor and friend, reported that the defendant disfigured his hand in 2021 while working with a homemade explosive device, and was stockpiling weapons and homemade ammunition. ECF No. 4 ¶ 6; *see also* ECF No. 14 (Pretrial Report) at 3 (noting defendant lost three fingers on his right hand); Tr. 5–6. At that time, the defendant lived in a suburban neighborhood in Suffolk. Tr. 9; ECF No. 14 at 1. Since the detention hearing, the government has obtained the defendant's hospital emergency room records, which indicate he told medical staff that he had a "firework" accident.

The CHS, who has a prior career in law enforcement, also observed the defendant in 2023 with an apparent short barrel rifle at a local gun range. ECF No. 4 ¶ 7; Tr 6. The CHS also provided the FBI a photograph of the firearm, which he obtained from the defendant, in a "go box" in the back of a car along with medical supplies, food, and water. ECF No. 4 ¶ 8; Tr. 6. The CHS also noted that the defendant was using pictures of the President for target practice at shooting at a local range, Tr. 7, stated that he believed political assassinations should be brought back, *id.*, and that missing children in the news had been taken by the federal government to be trained as school shooters, Tr. 7–8. The defendant also sent the CHS "memes" on social media expressing support for violence. Exhibit 1.[2] One depicts an individual in apparent riot gear and states "Peace is not always an option." *Id.* Another asks, "Where do you see yourself in 6 – 12 months?" with the

---

[2] The exhibits referenced herein, which were admitted at the preliminary and detention hearing, were attached to the government's initial motion to revoke, ECF No. 18.

response of an image of an individual hiding behind a tree with a rifle while people in uniforms walk past. *Id.* A third states "Tread on Those Who Tread on You." *Id.*

The defendant and the CHS continued to correspond in 2024. Shortly after the assassination attempt of then-Presidential candidate Donald Trump in Pennsylvania, the defendant stated that he hoped the shooter doesn't miss "Kamala." Tr. 9.[3] During that time, the defendant was seeking a sniper certification at the local gun range. *Id.*

In the fall of 2024, the defendant moved to a newly-purchased 20 acre farm in Isle of Wight, valued at $660,000 and in which he has over $300,000 in equity. Tr. 9 ; ECF No. 14 at 3. The CHS visited the defendant there in October 2024 and was wearing a wire. Tr. 9–10; ECF No. 4 ¶ 11. The defendant told the CHS that he had a short barrel rifle, and that the rifle was not registered because he does not believe in registration. Tr. 10; ECF No. 4 ¶ 11. In a conversation with his wife who inquired about the defendant keeping a jar labeled dangerous in the freezer accessible to her and their children, the defendant also stated he had HMTD, which is a highly unstable primary explosive device that does not require the addition of any materials to detonate. The defendant also told the CHS he had ETN, a secondary explosive device. Tr. 10–11. He also discussed fortifying the property with a 360-degree turret for a 50-caliber firearm on the roof, and noted how he could block the driveway with a vehicle so no other vehicles could access the property. Tr. 10. On December 6, 2024, ATF confirmed that the defendant had no registrations of short barrel rifles or destructive devices. ECF No. 4 ¶ 12; Tr. 11–12.

After learning about the potential presence of the highly explosive substance in a freezer at the defendant's home, the FBI obtained a criminal complaint and a search warrant for the

---

[3] The transcript states "Bro, hook, I don't miss Kamala" which is incorrect per the recollection of undersigned counsel. In any event, the government proffers that the statement relayed by the CHS was in substance what is proffered in the paragraph above.

defendant's 20-acre property, vehicles and person. The arrest and search warrant execution, which required complex planning and travel by numerous FBI personnel including bomb technicians, occurred on December 17, 2024. Tr. 12–13. The defendant was arrested at a traffic stop on his way to work, and was interviewed and admitted to having an unregistered short barrel rifle and HMTD in the freezer, but repeatedly denied having any destructive devices. Tr. 13. He also denied keeping any explosive materials in his home. Tr. 14. However, on a call to his wife during the interview, he stated that he would likely be going away for a lengthy period of time. Tr. 51.

The defendant was also asked about the injury to his hand. He claimed it was caused by a firework with flash powder, and stated he had made the firework in his garage and then brought it to a farm where it exploded. To the government's knowledge based on its investigation, the only farm to which the defendant would have had access is his mother and step-father's farm, which is the location of his proposed release. The defendant's wife was also interviewed. She stated the defendant had firearms but they were all legal, and denied knowledge of him having any explosive materials, including in the freezer. Tr. 14.

The FBI located a short barrel rifle in a safe in the master bedroom which was consistent in appearance to the one of which the CHS had provided a photograph in 2023. Exhibit 2; Tr. 14–15. The barrel length was 10.5 inches, substantially shorter than the legal requirement of 16 inches. 26 U.S.C. § 5845(a); *id.*; Tr. 15. In addition, the FBI found approximately 150 apparent explosive devices on the property, preliminarily assessed as the largest seizure by number of finished explosive devices in FBI history. Tr. 16, 53. FBI bomb technicians, who x-rayed the devices on scene, assessed them as homemade pipe bombs. Tr. 17–18, 21. The majority were found in ammunition cans in a detached garage, organized by color. Exhibit 3 at 1–2; Tr. 16. Some were

hand-labeled "lethal." Ex. 3 at 3; Tr. 21.[4] Approximately ten pipe bombs were found preloaded into an apparent wearable vest. Tr. 17–18; Ex. 3 at 4. In the garage, the FBI also found numerous tools and materials for manufacturing explosives, including powders, cut pieces of PVC pipe, and homemade fuses. Tr. 18; Ex. 3 at 5–7. The defendant also had a homemade Claymore, or mortar, Ex. 3 at 5, Tr. 18, riot gear, Tr. 19, Ex. 3 at 8, and ammunition for the short barrel rifle, Tr. 19.

In a freezer in the same garage, agents found a Mason jar labeled with a date in 2021, with orange tape and marked "Dangerous" and "Do Not Touch," matching the description of the HMTD. Tr. 20; Exhibit 4. This jar of highly unstable, primary explosive was found lying next to household food items, including Hot Pockets and frozen corn on the cob. Ex. 4; Tr. 21. While the case agent was not able to confirm whether the garage was kept locked, she noted it was unlocked when she entered and that had the SWAT unit found it locked, the door would have shown signs of forced entry, which it did not. Tr. 49.

Several additional pipe bombs were found completely unsecured in a backpack in the home's bedroom. Exhibit 6; Tr. 22. The backpack had a patch with a picture of a grenade and the phrase "#nolivesmatter."[5] *Id.*

The explosive materials and most of the apparent destructive devices were detonated on site as they were deemed too unstable to transport and maintain. Tr. 21. However, several were retained for analysis; one has been analyzed by the FBI's explosive unit and deemed to be an

---

[4] Detective Cardwell testified, based on initial information she had received on scene, that the items marked with blue were inert training devices. Tr. 17, 37. After the hearing, she consulted further with a FBI Bomb Technician, who provided that those devices were not inert, but instead different from the other devices because they contained plastic rather than metal spheres inside (*i.e.*, shrapnel). While the devices are still being analyzed, a preliminary assessment indicates that all recovered devices were live devices.

[5] Based on its prior investigations, the FBI understands the term "nolivesmatter" to refer to an online chat group that promotes targeted attacks, mass killings, and criminal activity, and believes societal standards should be destroyed.

improvised explosive device ("IED") made of an outer hard plastic tube with an inner plastic tube; in between the tubes were metal spheres which "would enhance the fragmentation effect of the device upon its explosion." *Id.*; Defendant's Ex. 1. The lab concluded that the device was "capable of causing property damage, personal injury, and/or death." Def. Ex. 1.

Finally, inside the home was a notebook, the cover of which bore the insignia of the defendant's place of employment, Collins Machine Works, a machine shop. Exhibit 5. The notebook contained apparent "recipes" for how to make explosive materials and devices, including grenades, HMTD, C4, and ETN. It also included a weapons inventory, and inventories of materials that can be used for the manufacture of explosives. *Id.* The notebook page entitled "Firework stars" was blank. *Id.* at 9.

> 3. *The Relevant Factors Weigh in Favor of Detention, and the Defendant Poses an Extreme Danger to the Community*

The § 3142(g) factors weigh in favor of detention and show that the defendant's release poses a danger to the community that cannot be mitigated by any available conditions. Regarding the nature and circumstances of the offense, while the defendant is currently charged with a single count pertaining to his unlawful possession of an unregistered short-barrel rifle, 26 U.S.C. § 5861, which carries a statutory penalty of up to ten years in prison, 26 U.S.C. § 5871, he faces numerous additional potential charges for his unlawful possession of unregistered destructive devices, each of which carries an additional charge of ten years of imprisonment. While there is no rebuttable presumption of detention, notably, the nature of his offense is one that the Bail Reform Act specifically designates as important in assessment of the first factor. *See* 18 U.S.C. § 3142(g)(1) (considering "whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, *firearm, explosive, or destructive device*" (emphasis added)).

9

The weight of the evidence on the existing charge in the pending complaint is extremely strong, given the seizure of the short barrel rifle and the defendant's prior recorded statement that it was unregistered because he does not believe in registration. *See also* Tr. 61–62 (noting that the weight of the evidence is "quite substantial").

As to the third factor, the history and characteristics of the person, the defendant lacks any criminal history and has long-standing ties to the community, steady employment, and substantial resources. While this factor generally weighs in the defendant's favor, particularly regarding any risk of flight, Tr. 62, it does little to mitigate his danger to the community.

The government submits that the overwhelming factor is the fourth, namely "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). The defendant has the undisputed know-how, resources, and extreme inclination to manufacture and stockpile improvised explosive devices. Even after losing his own fingers as a result of his homemade explosive materials, he made the apparent remarkable decision to keep an extraordinarily dangerous explosive material in the home's freezer next to food items that could be accessed by the entire family. Given the defendant's recent move to his new property, it is also clear that he has engaged in very recent activity with respect to explosives— either by manufacturing them at his new property or deliberately deciding to bringing them with him when moved.

While the defendant is not known to have yet engaged in any actual violence, he has certainly expressed interest in the same, through his manufacture and hoarding of pipe bombs containing shrapnel and marked "lethal," his possession of riot gear, a vest loaded with ten pipe bombs and a backpack in his bedroom with still more pipe bombs, his support for political

assassinations and use of the pictures of the President for target practice, and his support of the beliefs that "no lives matter" and "peace is not always an option."

The imposed conditions, including electronic monitoring and the third-party custodian, defendant's mother, are simply insufficient to mitigate these extraordinary risks to public safety. They would do little to prevent him from procuring more firearms, including a sniper rifle which he possessed when the search warrant was executed. The defendant also has the skills and inclination to make dangerous destructive devices from easily available household items, including PVC pipe and chemicals. He has also shown no inclination follow rules, in light of his statements about not believing in registration of firearms and his repeated false statements to agents about the presence of explosive devices at his home.

The release order unreasonably places the dangerous burden of policing the defendant to ensure he does not again make volatile explosive materials on his mother. It also places this burden on the pretrial officers, federal government employees who must periodically inspect the residence of a defendant who has expressed significant anti-government beliefs and was in the process of fortifying his new house with weaponry including the pipe bombs, a turret for a 50 caliber gun, and a driveway that could be blocked.

The defendant has argued that the defendant is not dangerous because "the government has been investigating and carefully watching Mr. Spafford for approximately two years" and that "[d]uring all of this time, there is no evidence that Mr. Spafford committed or attempted to commit any act of violence." ECF No. 21 at 2. Similarly, the Magistrate Judge stated that "the government's been aware of this potential risk since January of '23, and on the one hand it's been almost two years since they finally acted on it." Tr. 67. Both of these statements discount the defendant's stockpiling of pipe bombs behind the closed doors of his own home, which he

11

concealed from the CHS. Until the CHS's visit to the defendant's new home in October 2024, the extent of the CHS (or the government)'s specific knowledge regarding the defendant and explosives was the defendant's accident in 2021, which the defendant would almost certainly have contested as sufficient sole support for a search or arrest warrant for explosives years later. *See* Tr. 27 (CHS never saw the defendant make explosives). But once the defendant stated on a recorded wire that he had an unstable primary explosive in the freezer in October 2024, the government moved swiftly to obtain a complaint and plan and execute a complex and hazardous search warrant execution.

The defendant also inaccurately contends there is no evidence "the defendant had the means or equipment necessary to explode the devices." ECF No. 21 at 2–3. First, the HMTD the defendant kept in the freezer required nothing to additional to explode other than heat or friction, such as unscrewing the lid of the Mason jar in which the defendant kept the explosive. Tr. 11. Second, the defendant's own Exhibit 1—containing the FBI Bomb Technician's analysis of one device—showed that the defendant's IED was designed to explode with the application of only a "flame." Third, the government also proffers herein that it has consulted with a FBI Bomb Technician, who has indicated that all but one of the defendant's destructive devices appear to be able detonate with only a flame. Some of these were equipped with a "hobby fuse," similar to a string, while others had protruding matches, as shown in the picture in the top left image on page 3 of Exhibit 3. Devices with protruding matches were equipped with sandpaper on the opposite end of the device, enabling ready striking for ignition. The remaining single device was equipped with an "electronic match," which could be ignited with a readily accessible 9 Volt battery rather than a flame.

CONCLUSION

The defendant poses a danger to the community which cannot be sufficiently mitigated by any conditions, and thus preclude him being granted bail. The government respectfully submits that the order of release should be revoked.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____/s/_____
E. Rebecca Gantt
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Phone: (757) 441-6331
E-Mail: rebecca.gantt@usdoj.gov