```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF VIRGINIA
 2                            Norfolk Division

 3

 4    - - - - - - - - - - - - - - - - - -
                                          )
 5      UNITED STATES OF AMERICA,          )
                                           )
 6      v.                                 )    CRIMINAL ACTION NO.
                                           )    2:24mj211
 7      BRAD KENNETH SPAFFORD,             )
                                           )
 8           Defendant.                    )
                                           )
 9    - - - - - - - - - - - - - - - - - -  )

10                        TRANSCRIPT OF PROCEEDINGS

11                  (Preliminary and Detention Hearing)

12                            Norfolk, Virginia

13                          December 30, 2024

14

15
      BEFORE:
16            THE HONORABLE LAWRENCE R. LEONARD
              United States Magistrate Judge
17

18    APPEARANCES:

19
              UNITED STATES ATTORNEY'S OFFICE
20            By:  Rebecca Gantt
                   Assistant United States Attorney
21                 Counsel for the United States

22
              RULOFF SWAIN HADDAD MORECOCK TALBERT & WOODWARD, PC
23            By:  Lawrence H. Woodard, Jr.
                              And
24            SWARTZ, TALIAFERRO, SWARTZ & GOODOVE
              BY:  Jeffrey Swartz
25                 Counsel for the Defendant
```

1                                **I N D E X**

2  **GOVERNMENT'S**
   **WITNESSES**            **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**
3
   RACHEL ANN CARDWELL       5          26          50            51
4

5  **DEFENDANT'S**
   **WITNESSES**            **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**
6

7  NONE

8                              **E X H I B I T S**

9

10 **GOVERNMENT'S**
   **NO.**                                                        **PAGE**
11
   1                                                              15
12 2                                                              15
   3                                                              16
13 4                                                              20
   5                                                              25
14 6                                                              22
   7                                                              13
15

16

17 **DEFENDANT'S**
   **NO.**                                                        **PAGE**
18
   1                                                              42
19 2                                                              43

20

21

22

23

24

25

```
 1                (Hearing commenced at 11:05 a.m.)
 2           THE CLERK:  United States of America versus Brad
 3   Kenneth Spafford, case 2:24mj211.
 4           Is the government ready to proceed?
 5           MS. GANTT:  The United States is ready.
 6           Good morning, Your Honor.
 7           THE COURT:  Good morning, Ms. Gantt.
 8           THE CLERK:  Is the defendant ready to proceed?
 9           MR. WOODWARD:  Good morning, Your Honor.  We are
10   ready to proceed.
11           THE COURT:  All right.  Good morning, gentlemen.
12           MR. SWARTZ:  Good morning, Judge.  Thank you for --
13           THE COURT:  This matter is scheduled for both a
14   preliminary and a detention hearing, and it was originally
15   set, I guess last week, perhaps, but you all asked it to be
16   set today.
17           So, Mr. Woodward, how are we proceeding?  Are we
18   going forward with both?
19           MR. WOODWARD:  Yes, Your Honor.  The way we are
20   going to proceed is that I'm going to handle just
21   questioning any witnesses and proffering, and Mr. Swartz is
22   going to argue detention, if we get to that point.
23           THE COURT:  All right.  Very well.
24           All right, Ms. Gantt.  This is how I would like to
25   do this.  I don't want to have to repeat things, so I will
```

1    take into consideration whatever you offer in the

2    preliminary hearing aspect of the case, and then if you want

3    to supplement that after I make any finding necessary, you

4    can supplement it with any proffer regarding the question of

5    bond.  Okay?

6            MS. GANTT:  Thank you, Your Honor.  I don't plan on

7    having additional proffer at this point.  It will just be

8    the testimony.

9            THE COURT:  All right.

10           MS. GANTT:  The government calls Rachel Ann

11   Cardwell.

12           THE COURT:  All right.  Come forward, please, to

13   the witness box, and Lisa will administer the oath.

14           (Witness was sworn.)

15           MS. GANTT:  And with the Court's assistance, Your

16   Honor, I have all the exhibits in one packet, if I could

17   pass those up now.

18           THE COURT:  All right.  That would be fine.

19           MS. GANTT:  Thank you.

20           THE COURT:  The defense has seen them?

21           MS. GANTT:  Yes, Your Honor.

22           MR. WOODWARD:  Yes, Your Honor.

23           RACHEL ANN CARDWELL, called by the Government,

24   having been first duly sworn, was examined and testified as

25   follows:

```
 1                       DIRECT EXAMINATION
 2   BY MS. GANTT:
 3   Q.  Good morning.
 4   A.  Good morning.
 5   Q.  Could you please introduce yourself to the Court.
 6   A.  Yes.  I'm Detective Rachel Ann Cardwell with the Suffolk
 7   Police Department and a Federal Task Force Officer with the
 8   Norfolk FBI.
 9   Q.  And what is your background in law enforcement?
10   A.  I was hired on as a uniform patrol officer in 2009,
11   promoted approximately 2011 to detective in the City of
12   Suffolk Police Department.  In 2015 I was transferred to the
13   Norfolk FBI and was granted a federal task force position,
14   and I have been there since, working federal violations for
15   international and domestic terrorism.
16   Q.  And are you a part of the Joint Terrorism Task Force?
17   A.  I am a part of the JTTF, yes, ma'am.
18   Q.  Are you the lead case agent in this investigation into
19   Brad Spafford?
20   A.  Yes, I am.
21   Q.  Can you please explain how this investigation started.
22   A.  Yes.  In approximately January of '23, I received
23   information from a confidential human source that they had
24   some concerns about Brad Spafford in reference to having
25   been -- missing part of his hand due to a homemade explosive.
```

Cardwell, R. - Direct                                                    6

1    Q.   And what was the nature of the relationship between the
2    CHS and Mr. Spafford?
3    A.   They were friends and neighbors.
4    Q.   And have they continually communicated up until
5    Mr. Spafford's arrest?
6    A.   Yes.
7    Q.   Does the CHS have any relevant background?
8    A.   The CHS has approximately 20 years of law enforcement
9    background.
10   Q.   In addition to the explosives you mentioned, did the CHS
11   also report concerns to the FBI regarding firearms?
12   A.   Yes.  The CHS reported that he believed that Mr. Spafford
13   was in possession of a short-barreled rifle, that they had
14   received a photograph of it in a box, what I would refer to
15   as a Go Box with -- in the back of their Dodge Durango.
16   Q.   And had the CHS received that picture from Mr. Spafford?
17   A.   Yes.
18   Q.   Had he provided it to the FBI?
19   A.   Yes.
20   Q.   And was it reviewed by ATF and deemed to be an apparent
21   short-barreled rifle?
22   A.   Yes, it was.
23   Q.   You mentioned that it was in a box.  What kind of box was
24   it?
25   A.   There was a box in the back of his Dodge Durango that

Cardwell, R. - Direct                                               7

```
 1   was -- it appeared to be like a form of a Pelican case, and
 2   inside that case was medical supplies, extra ammunition,
 3   magazines, water, food supplies, what appeared to be the SBR,
 4   and a variety of other, like, medical-type supplies.  It
 5   would be very much the same thing that would be in my vehicle
 6   for like a prepared, ready go bag to grab in case of an
 7   emergency.
 8   Q.  Did the CHS also have knowledge of Mr. Spafford going to
 9   shoot firearms at a local range?
10   A.  Yes.  Mr. Spafford had a membership, a local private
11   range in the City of Suffolk, and had been doing -- had a
12   membership there for a while and had been attending that
13   range on and off and was doing a variety of qualifications,
14   according to the range, to include some sniper qualifications
15   at 300 and 400 yards.
16   Q.  And that in 2023 did the CHS report that Mr. Spafford was
17   using certain images for target practice?
18   A.  Yes.  The CHS reported that he was using a picture of the
19   president as a target at that range.
20   Q.  What did the CHS report about Mr. Spafford stating about
21   the Federal Government and missing children?
22   A.  So the CHS reported that they had conversations with
23   Mr. Spafford in reference to Mr. Spafford believing that we
24   need to bring back political assassinations, that he also
25   believed that some of the missing children that were being
```

1    taken by the government were actually being converted into

2    school shooters.

3    Q.  If I could have you take a look at what's before you as

4    Exhibit 1.

5    A.  Yes.

6    Q.  Do you recognize that document?

7    A.  I do.

8    Q.  What is it?

9    A.  This was some images that were shared between the CHS and

10   Mr. Spafford on a social media platform.

11   Q.  And to your knowledge were they shared by Mr. Spafford to

12   the CHS?

13   A.  Yes.

14   Q.  And can you please describe each of the three images.

15   A.  Yes.  The first picture is an individual standing, and

16   the statement says, "Peace is not always an option."

17          The second photograph is a picture of an individual

18   standing behind a tree with what appears to be a rifle and a

19   variety of individuals that appeared to be in some form of

20   uniform.  It says, "Them:  Where do you see yourself in 6 to

21   12 months?  Me:"  And there's the photograph.

22          The last one is a picture of a tank, and it says,

23   "Tread on those who tread on you."

24   Q.  In 2023 did you see confirmation of whether Mr. Spafford

25   had registered any short-barreled rifle from ATF?

1    A.  Yes.  I reached out to the ATF and sent in a official

2    request.  They denied having any tax stamp or explosive

3    licenses for Mr. Spafford.

4    Q.  You mentioned Mr. Spafford making comments about bringing

5    back political assassinations.  Did the CHS report having a

6    specific conversation in 2024 with Mr. Spafford?

7    A.  Yes.  Shortly after the attempted assassination of

8    President Donald Trump, a statement was made along the lines

9    of, "Bro, hook, I don't miss Kamala."

10   Q.  And was it around that time that Mr. Spafford was seeking

11   a sniper certification at the local range?

12   A.  Yes.

13   Q.  All right.  In 2023 and until late 2024, where was

14   Mr. Spafford living?

15   A.  During the beginning of the investigation, Mr. Spafford

16   and his family were living in the City of Suffolk off of

17   Kilby Shores area.

18   Q.  Is that in a Suburban neighborhood?

19   A.  Yes.  In a neighborhood division.

20   Q.  And then did he and his family purchase a new property in

21   late 2024?

22   A.  Yes.  In late 2024 they moved to approximately a 20-acre

23   farm in Isle of Wight County.

24   Q.  Okay.  In the fall of 2024 did the CHS visit Mr. Spafford

25   there?

Cardwell, R. - Direct                                             10

```
1   A.  Yes.
2   Q.  And was the CHS wearing a wire?
3   A.  Yes.
4   Q.  Have you reviewed the recording?
5   A.  Yes, I have.
6   Q.  What statements did Mr. Spafford make about
7   short-barreled rifles?
8   A.  Mr. Spafford advised the CHS that he did not believe in
9   registering firearms and that he had a short-barreled rifle
10  that was not registered.
11  Q.  Did Mr. Spafford also show the CHS around the property
12  and talk about his plans for certain defenses?
13  A.  Yes.  During the contact, they walked around this 20-acre
14  property, and one of the conversations was that Mr. Spafford
15  wanted -- said that he could disable a vehicle in his
16  driveway, and that would stop anybody from being able to get
17  to his residence without going out on foot.
18          One of the other conversations was that Mr. Spafford
19  said that he wanted to install a 50-cal turret, which would
20  come up and give a 360-degree radius for observation on his
21  property with a 50-cal weapon.
22          THE COURT:  With a what?
23          THE WITNESS:  50 cal, 50-caliber weapon.
24  BY MS. GANTT:
25  Q.  Was there also a discussion about explosives during that
```

1   visit?

2   A.   Yes.   During this visit Mr. Spafford's wife, Jackie

3   Spafford, entered the conversation and asked what was in the

4   jar that was in their freezer, and Mr. Spafford said that it

5   was HMTD and that it was marked "dangerous" and said "do not

6   touch" or "dangerous" with a label around it in the freezer.

7   Q.   What do you know HMTD to be?

8   A.   HMTD is a combination of basic household ingredients.

9   It's a peroxide-based component.   It is a primary explosive,

10  and it is very volatile.   It can be detonated upon friction,

11  shot, flame.   It can also detonate based upon the temperature

12  change of the actual chemical.

13  Q.   And what does it mean for something to be a primary

14  explosive?

15  A.   A primary explosive would indicate that it doesn't need

16  another element to detonate.

17  Q.   So nothing else needs to be added to it for it to --

18  A.   Right.   It doesn't need a blasting cap to go off or

19  something of that measure.

20  Q.   Were there also discussions about another form of

21  explosive material?

22  A.   Yes.   He talked about having ETN, which is a secondary

23  explosive element.   It is a chemical.   It does require a

24  second element to detonate it, like a blasting cap.

25  Q.   Following your review of the recording, did you again

1    seek confirmation from ATF as to whether Mr. Spafford had

2    registered any short-barreled rifles or destructive devices?

3    A.  Yes, I did.  And they confirmed that he did not have any

4    licenses.

5    Q.  And was that on or about December 6 of this year?

6    A.  Yes, it was.

7    Q.  After that did you obtain a criminal complaint and search

8    warrant for the residence in Isle of Wight of Mr. Spafford's

9    vehicles and his person?

10   A.  I did, and his phone.

11   Q.  Did you prepare and sign the affidavit docketed at ECF

12   Number 4?

13   A.  Yes, I did.

14   Q.  And is the date on that -- is the date on the criminal

15   complaint in October, is that the date of the CHS's visit?

16   A.  Yes, October 19th.

17   Q.  And is everything in there true and correct to the best

18   of your knowledge?

19   A.  Yes, ma'am.

20         MS. GANTT:  Your Honor, I'd move to admit or

21   incorporate by reference affidavit, which I have marked as

22   Exhibit 7.

23         THE COURT:  All right.

24         MR. WOODWARD:  What exhibit number?

25         MS. GANTT:  7.

Cardwell, R. - Direct                                            13

1           MR. WOODWARD:  We have it, Your Honor.
2           THE COURT:  The affidavit will be admitted.
3           (Government's Exhibit 7 received in evidence.)
4           MS. GANTT:  Thank you, Your Honor.
5    BY MS. GANTT:
6    Q.  When did FBI execute the search warrants?
7    A.  December 17th, 2024.
8    Q.  Starting with Mr. Spafford's arrest, where was he
9    arrested?
10   A.  He was arrested on 258 during a traffic stop with the
11   Norfolk FBI and other team members of the FBI.
12   Q.  Was he on his way to work?
13   A.  Yes, he was.
14   Q.  Was he interviewed?
15   A.  Yes, he was.
16   Q.  And what relevant statements did he make?
17   A.  Mr. Spafford was cooperative.  He did advise the agents
18   that he did have HMTD in the freezer, and he also advised
19   that he did have an unregistered short-barreled rifle at the
20   residence.
21   Q.  Was he asked about other -- any other explosive materials
22   or destructive devices on the property during the interview?
23   A.  Yes.  Numerous times he was asked if there was any other
24   explosive devices on property or premise, and he denied that
25   any elements were on his property.

Cardwell, R. - Direct                                                    14

1    Q.  Was he also specifically asked about whether he kept any

2    materials inside the house?

3    A.  Yes, he was.  He denied having anything inside the

4    residence.

5    Q.  Was Mrs. Spafford also interviewed at the time of the

6    search warrant execution?

7    A.  Yes.  Mrs. Spafford was interviewed, and she was

8    cooperative.

9    Q.  And what did she state about firearms and explosive

10   material?

11   A.  She said that they had firearms and that they, to her

12   knowledge, were all legal, and that they were in a safe

13   inside their master bedroom.

14   Q.  And what about explosives?

15   A.  She denied having any knowledge of any explosives on the

16   property.

17   Q.  And how about in a freezer?

18   A.  She denied having knowledge of any explosive devices in

19   the freezer.

20   Q.  I'd like to have you take a look at what's marked as

21   Exhibit 2.

22   A.  Yes.

23   Q.  What is that?

24   A.  This is the rifle that was in the closet of the master

25   bedroom in the safe, and is also what appears to be the same

1  rifle that was pictured in the Go Box that was sent to the
2  CHS.
3  Q.  So consistent with the picture you obtained in 2023?
4  A.  Yes.
5       MS. GANTT:  Your Honor, I move to admit Exhibit 2,
6  and I don't believe I ever moved to admit Exhibit 1, so I'd
7  move to admit that as well.
8       THE COURT:  All right.  Exhibit 1 and 2 will be
9  admitted.
10      (Government's Exhibits 1 & 2 received in evidence.)
11      MS. GANTT:  Thank you, Your Honor.
12 BY MS. GANTT:
13 Q.  Can you explain the measurement here in Exhibit 2?
14 A.  Yes.  So this was measured by ATF agent that was on
15 scene.  It is a 10.5-inch barrel.  As you can see in this
16 measurement, it shows that it's approximately 13 and a half.
17 There is a three-inch device that is put on the end of it.
18 It is not welded to it, so they don't count that as part of
19 the measurement.  Even with that, it's still under the
20 16-inch standard.
21 Q.  And that thing is -- unscrews on and off, to your
22 understanding?
23 A.  Yeah.  If it unscrews, it's not part of the measurement.
24 If it is welded on, it is part of the measurement, but it is
25 not.

Cardwell, R. - Direct                                                    16

1   Q.  Also in the bedroom did the FBI find the Go Box or go bag

2   that was in the picture?

3   A.  Yes.  It was in the master bedroom floor.

4   Q.  Were explosive materials and destructive devices found on

5   the property?

6   A.  Yes, there was.

7   Q.  Approximately how many in total?

8   A.  In total there was approximately 150 devices found on

9   premise.

10  Q.  All right.  If I could have you take a look at Exhibit 3.

11  A.  Yes.

12  Q.  Which has eight pages.

13  A.  Yes, ma'am.

14  Q.  Do you recognize this exhibit?

15  A.  I do.

16  Q.  And what are depicted in these pictures?

17  A.  These are ammo cans that were found inside the double

18  garage.  It's a detached double garage on the property, not

19  too far from the primary residence.

20          MS. GANTT:  Your Honor, I move to admit Exhibit 3.

21          THE COURT:  All right.  Exhibit 3 will be admitted.

22          MS. GANTT:  Thank you.

23          (Government's Exhibit 3 received in evidence.)

24  BY MS. GANTT:

25  Q.  If we could move to Page 2.

1    A.  Uh-huh.

2    Q.  What is shown there?

3    A.  These are opening the device can -- the cans, you can see

4    there are destructive devices inside.  They are different

5    codings on -- color codings in them.  So according to the

6    bond technicians, when they were looking at these different

7    devices, the blue ones appear to be inert or training devices

8    where the yellow ones and the other color coded ones are

9    actual live devices.

10   Q.  And what did the bomb technicians assess them on, assess

11   these devices as on scene?

12   A.  On scene they assessed them as pipe bombs.

13   Q.  If we could go to Page 3.  Starting with the top left

14   picture, what's shown there?

15   A.  This is a device that has a fuse of a striker fuse, which

16   is basically like a matchstick strike.  So it's a quick

17   strike device.

18   Q.  And how about in the top right photo?

19   A.  In the top right, this particular device is labeled "1/4

20   lethal."

21   Q.  All right.  Were there multiple devices with the "lethal"

22   label on them?

23   A.  Yes.

24   Q.  All right.  And then if we could go to Page 4.

25   A.  On Page 4, this is what appears to be like a vest that

Cardwell, R. - Direct                                            18

1   was loaded with these pipe bombs in it.

2   Q.  And that's how it was found, with those devices in there?

3   A.  Yes.  It was found just as this picture depicts.

4   Q.  Were these devices assessed as being homemade?

5   A.  Yes, they were.

6   Q.  Did the FBI also find materials and tools indicative of

7   manufacturing of these devices?

8   A.  Yes.  There was numerous precursors found on the property

9   to make these devices, to include powders, different powders,

10  metals, the actual components, the PVC pipe already cut, the

11  fuses, homemade fuses, things of that nature were all found

12  in that double garage.

13  Q.  If we can go to Page 5.  What's in the box on the left?

14  A.  The box on the left, according to the bomb technicians,

15  is what they would call an improvised Claymore.  It's a

16  homemade Claymore.  It appears that it was actually used with

17  like glued together with either hot glue or potentially

18  crayons.  That center black box in the middle, they advise

19  that is an electronic firing system, which would be

20  indicative of a homemade Claymore.

21          THE COURT:  Homemade what?

22          THE WITNESS:  Claymore.

23  BY MS. GANTT:

24  Q.  And with the box with the white powders was -- what was

25  found in there of relevance?

JODY A. STEWART, Official Court Reporter

1   A.  There's a variety of different powders, but one of the

2   powders is ETN.

3   Q.  What's shown on Page 6?

4   A.  On Page 6 this is a -- like a toolbox that has like all

5   of the different devices in different stages.  Some of them

6   were not made yet, some of them were partially made, and then

7   this also shows like the -- there was BBs as well that was

8   found in this box and homemade fuses.

9   Q.  And in the top right there, are those pieces of PVC pipe?

10  A.  Yes.

11  Q.  Let's go to Page 7.

12  A.  These are also more items that were found in this

13  canister.  You can see the one device looks like it's being

14  partially made.  It has like a fuse coming out of the top of

15  it, but this isn't a full device yet, according to the bomb

16  technicians.

17  Q.  All right.  And then finally Page 8?

18  A.  This has -- in a box we found what appeared to be riot

19  gear, and then we found a bunch of ammunition that supported

20  the short-barrel rifle, 223 and 556 rounds.  According to the

21  ATF agent, that SBR would support either one of those rounds.

22  Q.  Was there a freezer in this garage as well?

23  A.  Yes.  There is a small chest freezer found in this double

24  garage.

25  Q.  If we could take a look at Exhibit 4.

1   A.   Yes.

2   Q.   Do you recognize that?

3   A.   Yes.

4   Q.   What is it?

5   A.   This is a Mason jar that is labeled with, it looks like

6   what appears to be "3-11-21, dangerous, do not touch," and it

7   does have the orange band around it as described in that CHS

8   meet.

9          MS. GANTT:  Your Honor, I move to admit Exhibit 4.

10          THE COURT:  All right.  I'm sorry.  I don't

11   understand.  What is shown in Exhibit 4?

12          THE WITNESS:  This is what appears to be the HMTD

13   that was described --

14          THE COURT:  Are you saying ETN?

15          THE WITNESS:  HMTD.

16          THE COURT:  Okay.

17          (Government's Exhibit 4 received in evidence.)

18   BY MS. GANTT:

19   Q.   Was that what you discussed before, the primary explosive

20   that requires nothing to be added that Mrs. Spafford asked

21   Mr. Spafford about?

22   A.   Correct.

23          THE COURT:  All right.  I understand.

24   BY MS. GANTT:

25   Q.   And is it being kept in the freezer next to food items?

1   A.   Yes.   It's beside Hot Pockets and corn on the cob in the

2   top of the chest of freezer.

3   Q.   Have any of the destructive devices found in the garage

4   been examined by the FBI?

5   A.   Yes.   One of the devices was examined already by the

6   Quantico lab, and it was determined to be an improvised

7   explosive device.   Due to the elements of the device itself,

8   it has a hard outer shell.   It has powders.   It has

9   projectiles.   And the powder is consistent with an explosive,

10  and adding it together could cause property and/or life loss.

11  Q.   Are examinations of the other materials pending?

12  A.   Correct.

13  Q.   And were many of the devices detonated on scene?

14  A.   Yes.   The majority of the devices were detonated on

15  scene.   All of the devices were etch laid, and we put them in

16  basically color coded based upon, if they were blue, yellow,

17  if they were written "lethal" on them, et cetera.

18         We x-rayed them, and then we took one of each of

19  those devices and took and opened it up.   The bomb techs

20  opened it up and took the materials inside it, and then the

21  device itself, separated it and sent it to the lab, and they

22  are pending analysis.

23  Q.   All right.   You mentioned before that the short-barreled

24  rifle was found in the bedroom of the main home?

25  A.   Yes.

Cardwell, R. - Direct                                                    22

```
1    Q.  Was there something else found in the bedroom of

2    relevance?

3    A.  Yes.  There was a backpack that was near the Go Box.

4    Q.  If I could have you take a look at Exhibit 6.

5    A.  Yes.

6    Q.  Skipping ahead one exhibit.  Do you recognize that?

7    A.  I do.  This is the backpack that was found in the master

8    bedroom floor.

9    Q.  And is the outside of the backpack marked "no lives

10   matter"?

11   A.  Correct.

12   Q.  And what's on Page 2 of that exhibit?

13   A.  So inside this backpack, there was three devices found.

14   When the bomb techs x-rayed the devices, it actually is six

15   devices.  There are two devices put together, and they

16   both -- each end has the capability of being -- having an

17   ignition on it.  So they determined this is six additional

18   devices that were in the residence, the primary residence.

19   Q.  And they were not in the safe; is that correct?

20   A.  They were not in the safe.

21            MS. GANTT:  Your Honor, move to admit Exhibit 6.

22            THE COURT:  All right.  Exhibit 6 will be admitted.

23            (Government's Exhibit 6 received in evidence.)

24   BY MS. GANTT:

25   Q.  And finally, if I could have you take a look at Exhibit
```

1    5.

2    A.   Okay.

3    Q.   Do you recognize that?

4    A.   I do.

5    Q.   What is it?

6    A.   This is a journal that was found inside the residence.

7    Q.   And just, we will go through it in more detail, but in

8    general what did it contain of relevance?

9    A.   It contained what appeared to be recipes and inventory of

10   different devices and then also the inventory of powders and

11   elements, and some of them were consistent was what we found

12   on scene.

13   Q.   Going to what I've hand marked as Page 2.

14   A.   These are liquid and powdered inventories, and a lot of

15   these items were actually found inside that shed.

16   Q.   And are these items that can be used to make explosive

17   devices?

18   A.   Yes.

19   Q.   Going to Page 3.

20   A.   This is a recipe for homemade C4.

21   Q.   I'm sorry.  If you could back up one page.

22   A.   Oh, I'm sorry.  I skipped two pages.  Sorry.  These are

23   additional powders, and then the primary -- this is a recipe

24   for HMTD, and it also, like, down at the bottom shows like

25   the order in which you would put it in if you were going to

Cardwell, R. - Direct                                                    24

1   do an assembly.

2   Q.  Of a detonator cap?

3   A.  Yes, of a detonator cap.

4   Q.  And as you noted before, this notes on the fourth line

5   down in the right, "The HMTD is very sensitive to friction,

6   shock and flame"?

7   A.  Correct.

8   Q.  Going to the next page, is this the homemade C4?

9   A.  Yes.  This is the recipe for this homemade C4, and then

10  also on the other page is like reloading information for just

11  making of ammunition.

12  Q.  And what do you understand C4 to be?

13  A.  C4 is normally used in like military-type operations.

14  They use it for breaching.  It requires a license if you're

15  going to have it as a civilian, if they would even give it to

16  you.

17  Q.  Pages 5 and 6, are those inventories of rifles --

18  A.  Yes.

19  Q.  -- firearms and gunpowder?

20  A.  Yes, and primers.

21  Q.  Okay.  Let's go to Page 7.  The 37 millimeter loading in

22  the top right?

23  A.  Yes.

24  Q.  What's shown in the middle there in that table?

25  A.  In the middle it is a color coded pattern of grenades,

JODY A. STEWART, Official Court Reporter

1   and this appears to be very relevant to what we found on

2   scene, color coding-wise.  The stinger, for example, was tan,

3   and it was written "stinger" on that actual pipe bomb.

4   Q.  Going to Page 8.  Is this more information on grenades,

5   various types of grenades?

6   A.  Yes, and loading them, hand grenades, and then the

7   stinger grade.  They appear to be recipes for how to make

8   them.

9   Q.  Skipping ahead to Pages 10 and 11, what do those

10  describe?

11  A.  This is PETN, which is another secondary explosive.  This

12  appears to be the recipe to how to make it.  This is also a

13  secondary explosive which would require another element to

14  ignite it like a blasting cap, for example.

15          And on the last page, this is the ETN, which is also

16  that secondary explosive powder that was found on premise.

17          MS. GANTT:  Your Honor, I move to admit Exhibit 5,

18  if I didn't already.

19          THE COURT:  All right.  Exhibit 5 will be admitted.

20          (Government's Exhibit 5 received in evidence.)

21          MS. GANTT:  Thank you.  And those are all my

22  questions for this witness.

23          THE COURT:  All right.  Mr. Woodward, you may

24  inquire.

25          MR. WOODWARD:  Thank you, Judge.

```
 1                          CROSS-EXAMINATION
 2    BY MR. WOODWARD:
 3    Q.   My name is Larry Woodward.  I'm going to ask you -- do
 4    you want to be referred to as detective?
 5    A.   Anything is fine.
 6    Q.   Joint task force officer?
 7    A.   No, detective is fine.  Yes.  Thank you.
 8    Q.   So I first want to start with the beginning of the
 9    investigation.  Am I correct that as early as January of 2023
10    you had received information that Mr. Spafford had a
11    short-barrel rifle?
12    A.   Yes.
13    Q.   Okay.  And you got a picture of it?
14    A.   Shortly after that, yes.
15    Q.   Okay.  Maybe in February or so?
16    A.   Approximately.  I'd have to go back and look at the exact
17    dates.
18    Q.   Okay.  And that was the same short-barrel rifle that you
19    found in his gun safe when you conducted the search, from
20    what you could tell from the pictures?
21    A.   It appears to be, yes.
22    Q.   Okay.  And also, it's true that you knew as early as
23    January or maybe February of 2023 that Mr. Spafford had or
24    potentially had some homemade explosives?  You were told that
25    by the undercover agent or your confidential human source?
```

1    A.   Yes.   The conversation had taken place.

2    Q.   Did the confidential human source ever tell you that he

3    saw Mr. Spafford deploy or explode or use any homemade

4    explosive devices?

5    A.   No, they did not.

6    Q.   Okay.   Did he ever tell you that he saw Mr. Spafford make

7    them?

8    A.   No, he did not.

9    Q.   Okay.   And you also mentioned a go bag.   Tell us again

10   what was in the go bag?

11   A.   From my memory, it was extra rifle mags, the SBR, the

12   short barrel rifle, medical supplies, water, it looked like

13   there was potentially like food in there.

14   Q.   Okay.   Anything else?

15   A.   Knife.   I'd have to look at the picture again to remember

16   all the details, but I think that's the majority of what was

17   in it.

18   Q.   Was there any explosive in it?

19   A.   I do not know.

20   Q.   Well, when you found it -- well, let me ask a better

21   question.   When you initially heard about it, did you have

22   any information as an investigator that there were any

23   explosives in the go bag?

24   A.   Not to my knowledge.

25   Q.   Okay.   And when you found the go bag a couple of weeks

1   ago, did you find any explosives in it?

2   A.   Not in the box itself.   It was in the backpack.

3   Q.   All right.   You also said that you had information that

4   Mr. Spafford went to the shooting range?

5   A.   Yes, sir.

6   Q.   Okay.   And a lot of people go to the shooting range?

7   A.   Yes, sir.

8   Q.   Okay.   And at the shooting range, he was shooting the gun

9   that you now say -- that you found that was a short-barrel

10  rifle?

11  A.   He was shooting a variety of weapons.   There was a 308, I

12  think he was shooting there.

13  Q.   And just for the record, a 308 is a rifle?

14  A.   Like a sniper rifle, yes.

15  Q.   Like a long-barrel rifle?

16  A.   Long-barrel rifle.   And then during one of the times that

17  the CHS went to the range with them, the CHS reported they

18  believed that he had a short-barrel rifle but could not a

19  hundred percent confirm it because they couldn't lay their

20  rifle beside it to properly measure it.

21  Q.   Okay.   But you had had a picture of what looked like a

22  short-barrel rifle long before that?

23  A.   Yes.

24  Q.   Okay.   Did the confidential human source -- and at this

25  point in time, the beginning of your investigation,

1   Mr. Spafford was still living in Suffolk.  Did they say that
2   they ever saw any homemade explosives, or they just tell you
3   that he said he had them?
4   A.  They did not see them.
5   Q.  Never saw them.  Okay.
6        So then that would have been something that the CHS
7   says that Mr. Spafford told him?
8   A.  Yes.
9   Q.  You mentioned, and I don't want to take up too much time
10  on something I think -- other than October 19th when you say
11  there was a -- the confidential human source was wearing a
12  wire, were they wearing a wire any other times?
13  A.  Yes, sir.
14  Q.  So let's go through some of the things that you talked
15  about.  You mentioned some stuff about bringing back
16  political assassination and the Federal Government using
17  missing children for school shootings.  Is that recorded?
18  A.  The political assassination is recorded.  I cannot recall
19  if the other one is recorded or not.  I'd have to go back and
20  listen.
21  Q.  Okay.  So far as you know, Mr. Spafford never took any
22  steps to commit any political assassination, that you're
23  aware of?
24  A.  Not to my knowledge.
25  Q.  Okay.  You also said that he said he hated the Federal

1    Government, or words to that effect.  Did you ever have any
2    information that he took any steps against the Federal
3    Government?
4    A.  I didn't say that he hated the Federal Government.  I
5    didn't make that statement.
6    Q.  Maybe I misunderstood, then.  Let me ask the question
7    this way.  Have you had any information that Mr. Spafford has
8    engaged in this -- any anti-government activities other than
9    talking about not liking things the government did?
10   A.  Yeah, I didn't know.  It's all been verbal about
11   weaponizing the IRS and the overreach of the government with
12   taxation.  I don't know -- I haven't made it through
13   everything at this point, but as of --
14   Q.  I understand.
15   A.  -- right now that's what I know.
16   Q.  So as of right now what you know is he doesn't like the
17   IRS, and he thinks the government's too much in everybody's
18   business?
19   A.  Yes, sir.
20   Q.  Okay.  He's certainly not unique in that, based on your
21   experience as an investigator?
22   A.  No, he's not.
23   Q.  Okay.  Do you have Exhibit 7 with you, the copy of the
24   criminal complaint?
25   A.  Yes.

1    Q.  I want to go through that with you just a little bit.  So

2    the first paragraph, actually Paragraph 6, the first

3    paragraph under "facts supporting probable cause," talks

4    about Mr. Spafford disfiguring his hand in July of 2021.  Do

5    you see that?

6    A.  Yes, sir.

7    Q.  I mean, just so it's clear, you drafted and looked and

8    signed -- you signed this affidavit?

9    A.  Yes, sir.

10   Q.  Swore to the accuracy of it in order to get the criminal

11   complaint, correct?

12   A.  To the best of my knowledge, yes.

13   Q.  Okay.  All right.  So the devices that were found -- and

14   I'm going to ask a broad question here in this part -- that

15   were found on his property, you know, I guess almost three

16   and a half years later, just a couple of weeks ago, do you

17   know when those devices were made?

18   A.  I do not.

19   Q.  Okay.  Do you know how long he'd had them?

20   A.  I do not.

21   Q.  Okay.  Do you even know if he made them?

22   A.  I do not yet.

23   Q.  Okay.  All right.  You then say that the CHS reported

24   that Mr. Spafford and his friends are preparing for something

25   that Spafford would not be able to do alone.  Is that a

Cardwell, R. - Cross                                                    32

1    recorded conversation or is that just something the CHS told
2    you?
3    A.  That was something that the CHS told us.
4    Q.  And what was it they were preparing for?
5    A.  I do not know.
6    Q.  And who was the friend?
7    A.  I do not know.
8    Q.  Okay.  And when did he say that?
9    A.  It was early spring of '23, but I don't have the exact
10   date.
11   Q.  Okay.  Well, let me make sure I understand your
12   affidavit, then.  You are saying that that occurred not on
13   January 17th, 2023?
14   A.  No, that's when -- yes, the -- so the original
15   information came in on January 17th, 2023, and that talks
16   about the homemade firearms and then also about him preparing
17   for something he couldn't do alone.  So that's not recorded.
18   Q.  All right.  And it also didn't happen in the spring of
19   2023, because if you knew about it on January of 2023, he
20   would have have to have said it before then, right?
21   A.  Yes.  The conversation would have taken place prior.
22   Q.  So, look, you don't know when he said that?
23   A.  Not exactly.
24   Q.  Okay.  Did you find in the -- when you did your search --
25   equipment to reload ammunition or reload shotgun shells or

1    rifle shells?

2    A.   Yes.   There was a box in the shed in the double garage

3    shed that had supplies that would be indicative of reloading.

4    Q.   Okay.   And did you find ammunition out there?

5    A.   Yes.

6    Q.   How much?

7    A.   I don't know the exact number off the top of my head.

8    Hundreds.

9    Q.   I mean, let me ask a better question.   What calibers of

10   ammunition do you recall that -- what are the ones you

11   recall?

12   A.   We collected the 556 and 223 rounds.   There were other

13   rounds as well, but we did not collect anything that didn't

14   support the illegal firearm.

15   Q.   Okay.   So any legal weapons --

16   A.   -- were left on scene.

17   Q.   You were left on scene, and that along with whatever

18   ammunition would have been able to be fired in those weapons?

19   A.   Yes, sir.

20   Q.   Okay.   And as part of your investigation, did you run a

21   criminal background check on Mr. Spafford?

22   A.   I did.

23   Q.   And you determined that he was not a felon?

24   A.   Correct.

25   Q.   Okay.   You also said that when he was arrested, he was

1    going to work.  Do you know where he works?

2    A.   Yes.

3    Q.   And where is that?

4    A.   Collins Machine.

5    Q.   Collins Machine?

6    A.   Yes.

7    Q.   And where is that located?

8    A.   2703, if I remember correctly, Syers, S-y-e-r-s, Road,

9    Portsmouth, Virginia.

10   Q.   Okay.  Do you know how long he's worked there?

11   A.   I do not know the exact time frame.  I know he's worked

12   there for a while.

13   Q.   He worked -- let me ask a better question.  Has he been

14   working there since you started your investigation and first

15   learned wherever he worked?

16   A.   Yes.

17   Q.   Okay.  And you did some surveillance on Mr. Spafford

18   during your investigation?

19   A.   Yes.

20   Q.   He went to work regularly, so far as you know?

21   A.   Yes.

22   Q.   During any of the time you were surveilling Mr. Spafford,

23   did you ever see him do anything illegal?

24   A.   No, I did not.

25   Q.   Okay.  I want to now ask you another question about your

Cardwell, R. - Cross                                              35

```
 1   affidavit, item 7.  Did you have any physical evidence prior
 2   to the time -- about this case prior to the time that you
 3   executed the affidavit?
 4   A.  What do you mean physical evidence?
 5   Q.  Okay.  Let me ask you to look at Paragraph 4.  I'm going
 6   to ask you what you meant by it because you said in Paragraph
 7   4 that your affidavit was based on other physical evidence
 8   obtained during the investigation.
 9        So what did you mean by physical evidence, Detective?
10   You didn't have any, did you?
11   A.  Sir, there was -- we have a variety of different evidence
12   to do with phone pen, trap and traces.  We had other
13   evidences in reference to the surveillance and the CHS
14   recordings.
15   Q.  Okay.  Not -- that wasn't my question, ma'am.  So you
16   said observations were made or conveyed to me by individuals.
17   You talked about that.  Review of records.  That would be
18   pen, traps and tracings, correct?
19   A.  Uh-huh.
20   Q.  Documents, that would be -- you didn't have any physical
21   evidence when you signed this affidavit, did you?
22   A.  No.
23   Q.  Physical -- look, you know what physical evidence is.
24   It's guns, it's bullets, it's the backpack, it's all the
25   stuff you got during the search warrant?
```

1    A.   Correct.

2    Q.   You didn't have it?

3    A.   Not at that time.

4    Q.   Why did you put in your affidavit that you did?

5    A.   That is simply just a mistake in the writing of the

6    affidavit.

7    Q.   Okay.  All right.  Let's now talk about a little bit --

8    just a little bit about the search.  So the picture of the

9    rifle, you've talked about that.  You said that that's --

10   Exhibit 2 appears to be the same weapon that was in the

11   picture you got sent almost two years earlier in January of

12   '23?

13   A.   Yes, sir.

14   Q.   Okay.  And it was locked up in a gun safe?

15   A.   It was in a safe, yes.

16   Q.   Okay.  Well, was the safe locked?

17   A.   To my knowledge, yes.

18   Q.   So far as you know, it was locked?

19   A.   Correct.

20   Q.   And you all didn't have to break into the safe?

21   A.   No.  They gave us access.

22   Q.   Mrs. Spafford or my client gave you access and told you

23   that there were weapons and stuff in the safe?

24   A.   Yes, sir.

25   Q.   And then Exhibit 1 is some slogans or logos, correct?

1    A.   Yes.   They are Memes.

2    Q.   What are they?   Memes?

3    A.   Like Memes.

4    Q.   Okay.   And where did you get those from?

5    A.   They were received on -- from -- to the CHS from

6    Mr. Spafford on the social media platform.

7    Q.   And do you know when?

8    A.   I don't remember the exact date off the top of my head.

9    Q.   But prior to the search warrant?

10   A.   Yes, this was prior to the search warrant.

11   Q.   Do you know how long prior to the search warrant you had

12   those?

13   A.   Within the time that I opened the investigation till we

14   did the search warrant.

15   Q.   And then you went through a number of pictures.   Let me

16   first ask you:   You said you determined that some of the

17   devices were inert, or to be accurate you said the

18   technicians that were inert -- when you use the term "inert,"

19   what do you mean by that?

20   A.   The bomb technicians explained they appeared to be

21   training devices, which means that they wouldn't be like they

22   can hurt you.

23   Q.   They couldn't hurt you?

24   A.   Yeah.

25   Q.   Okay.   And out of the hundred and 50, you said, that you

1   found, approximately how many of them, if you recall, were

2   inert?

3   A.   I do not know the exact number, but it was not that many.

4   Q.   Okay.  And then what was the other color code?  You said

5   it was yellow?

6   A.   There was yellow ones.  They were what they determined to

7   be live devices, and then there were some tan, some had red

8   stripes on them.

9   Q.   And your testimony is that the ones that were yellow, tan

10  and red, what were the differences, or do you know?

11  A.   I don't know yet.  We are waiting on the analysis.

12  Q.   How many of them were destroyed or exploded on scene?

13  A.   We kept nine of the devices.  So the rest were detonated

14  on scene.

15  Q.   So 140 or so were detonated on scene?

16  A.   Approximately.

17  Q.   Okay.  And that included the nine that you kept.  Did

18  that include some of each color?

19  A.   Yes.  That's what we had asked for, yes.

20  Q.   Okay.  And were you there when they were detonated?

21  A.   Yes, sir.

22  Q.   And explain how that happened.

23  A.   So I'm, first of all, not a bomb technician.

24  Q.   Understood.

25  A.   Just to caveat that.  So basically what they did was they

1    removed them from the shed to -- they laid them out on a

2    trailer, flatbed trailer that was sitting out there just so

3    they could see what they had.  Then they moved them in

4    sections over to a hole that they dug in a field, and then

5    they did bomb tech stuff, and I do not know about what they

6    did.  I just know that they put some kind of covering over

7    the top of it to make it safer so it would only go so far

8    when they detonated.

9    Q.  Okay.  All right.  And so do you know or do you have

10   records there with you, the nine that you kept, what

11   substances were in any of those?

12   A.  We don't know yet.  It's pending analysis.

13   Q.  Okay.  Well, we received -- you talked about ETN?

14   A.  Uh-huh.

15   Q.  And you talked about PETN?

16   A.  Uh-huh.

17   Q.  Those are both secondary explosives?

18   A.  Correct.

19   Q.  They require some more components or some sort of ignitor

20   to create the oxidation to explode them, correct?

21   A.  Correct.

22   Q.  And the HMTD, which you say was in this jar in the

23   freezer, had that been tested?

24   A.  That was detonated on scene.  They did a post-blast

25   recovery on that.

1    Q.   Okay.  That means they picked up the soil around where

2    they exploded it, and they sent that to the lab?

3    A.   My understanding, yes.  I wasn't a part of that part.

4    Q.   So you've not seen any lab report that actually verifies

5    that that's HTND (sic)?

6    A.   HMTD, no.

7    Q.   HMTD.  Okay.  Do you know what the volume or what the

8    amount of that substance was, that jar?  I mean, we have a

9    picture.  Did you take any --

10   A.   They detonated it prior to me arriving that morning, so I

11   did not physically see it.

12   Q.   So do you know if as the case agent -- I mean, the

13   picture we have shows it laying there by some Tater Tots or

14   something, whatever that is?

15   A.   Hot Pockets and corn on the cob.

16   Q.   Hot Pockets, okay.  Do you know if anybody took it out of

17   the freezer and took like an investigative photo of it

18   sitting by itself?

19   A.   I don't know yet.  I haven't gone through the hundreds of

20   photos that they have taken, but that is the photo that was

21   given to me.

22   Q.   Okay.  And so you don't have any idea of the quantity?

23   A.   Not yet.

24   Q.   And you don't have any idea whether any of the devices,

25   that were exploded or tested, contained HMTD?

Cardwell, R. - Cross                                                        41

1    A.   The analysis is still pending.

2    Q.   Now, the one thing that you did analyze contained

3    Potassium perchlorate, correct?

4    A.   I don't know.  I'd have to refer to the lab --

5              MR. WOODWARD:  Your Honor, may I give her what I

6    can?  This is an e-mail.

7              MS. GANTT:  She has a copy of it, Your Honor.

8              THE WITNESS:  I don't have it with me up here.

9              MR. WOODWARD:  Can I?

10             THE COURT:  Sure.

11             MR. WOODWARD:  Beside it, to make sure I haven't

12   written anything.

13             THE COURT:  And what is it you are handing the

14   witness?

15             MR. WOODWARD:  That is an e-mail of -- that

16   Ms. Gantt sent to me, and then actually the copy she has, I

17   then sent it to Mr. Swartz.  But it's an analysis that came

18   in from Jason Miller at the FBI explosive unit.

19             THE COURT:  All right.

20   BY MR. WOODWARD:

21   Q.   Do you see that?

22   A.   I do.

23   Q.   Do you know what Potassium perchlorate is?

24   A.   No.

25   Q.   Okay.  All right.  Do you know if it's illegal?

Cardwell, R. - Cross                                                    42

1   A.  I do not.

2   Q.  You don't know anything about it?

3   A.  No.  I'm not a bomb technician.

4   Q.  Okay.  Can I get that back from you?

5   A.  Yes, sir.

6            MR. WOODWARD:  Judge, can I substitute this one in?

7            THE COURT:  You want to make it an exhibit?

8            MR. WOODWARD:  I guess Defense 1, Your Honor.

9            THE COURT:  All right.  Defense Exhibit 1 will be

10   received.

11            (Defendant's Exhibit 1 received in evidence.)

12            THE COURT:  Are you going to ask the witness any

13   more questions about the exhibit?

14            MR. WOODWARD:  No, Your Honor.  She said she

15   doesn't know what it is.  I'm just going to put it in for

16   the fact that it exists.

17            THE COURT:  Give me a moment to read it.

18            (Pause).

19            THE COURT:  All right.

20            MR. WOODWARD:  All right.  Thank you.

21   BY MR. WOODWARD:

22   Q.  Now, the exhibit that is the notebook, that I'll call it,

23   correct?  You have that?

24   A.  Exhibit 5?

25   Q.  Exhibit 5.  All right.  And that also has, in the back of

Cardwell, R. - Cross                                                        43

1    it, a list of some of Mr. Spafford's family members, their
2    dates of birth, their licenses?
3    A.   That, I do not have with me.  That was not part of this
4    particular exhibit that was submitted to the courts.
5           MR. WOODWARD:  Well, then, Your Honor, for the
6    record of completeness, I have a complete copy of that
7    notebook.  I didn't realize that the one the government gave
8    wasn't a complete one, so I'd like to make this Defense 2
9    and give her the complete one, make sure --
10          MS. GANTT:  Your Honor, I omitted it because it has
11   personal passwords for online items, so it should probably
12   be under seal.  The full copy should probably be under seal.
13          THE COURT:  All right.  Very well.  We will receive
14   Defense Exhibit 2, identified as the remaining parts of the
15   journal previously marked as Government's Exhibit 5.
16          MR. WOODWARD:  Yes.
17          THE COURT:  All right.  This one will be filed
18   under seal given the personal identifying information
19   contained therein.
20          MR. WOODWARD:  And when you get through marking
21   that, I'll give it to her.
22          (Defendant's Exhibit 2 received in evidence.)
23          THE COURT:  All right.  You want this to go to the
24   witness?
25          MR. WOODWARD:  I would like for it, just a couple

Cardwell, R. - Cross                                                    44

1    of questions, Your Honor.

2           THE COURT:  All right.

3    BY MR. WOODWARD:

4    Q.  Would you take a minute and look at that and, I guess,

5    particularly the last few pages and ask me if you recognize

6    that as all being part of the same notebook?

7    A.  Yes, sir.

8    Q.  Okay.  And without saying what they are, that notebook

9    also contained a lot of birthdays and passwords and names of

10   family members and other personal and biographical

11   information about both Mr. Spafford and his family, correct?

12   A.  Correct.

13   Q.  And the information is in there that the government asked

14   you about, you have -- that's not dated, is it?  You have no

15   idea when that was put in there?

16   A.  No.

17   Q.  Or how long that notebook had been in existence?

18   A.  Uh-uh, I do not know.

19   Q.  Okay.  Do you know where it was found, what's in the

20   home?

21   A.  I do not know the exact room it was located in, off the

22   top of my memory.

23   Q.  Okay.  But it was found in the home -- I mean, in the

24   house?

25   A.  In the residence, yes.

Cardwell, R. - Cross                                                45

```
1              MR. WOODWARD:  Okay.  All right.  That's all I have
2     with that, Your Honor.  We can get it back and put it under
3     seal.
4     BY MR. WOODWARD:
5     Q.  The other picture you were shown, the other exhibit you
6     were shown by Ms. Gantt was 6.  Do you have that there in
7     front of you?  It's the "no lives matter"?
8     A.  Yes, sir.
9     Q.  And then the --
10    A.  Yes, sir.
11    Q.  Okay.  So the three items that are Page 2 of Paragraph 6,
12    they were found in a backpack in the bedroom?
13    A.  Yes.
14    Q.  And when we are saying "the bedroom," we are talking
15    about the master bedroom?
16    A.  Yes.
17    Q.  Where presumably Mr. Spafford and his wife, that was
18    their bedroom?
19    A.  Presumably, yes.
20    Q.  Do you know anything about those three devices?
21    A.  I only can tell you what the bomb techs told me.
22    Q.  Okay.  So you don't know if they're inert, you don't know
23    if they're lethal, you just know they were there?
24    A.  I just know they were there.  They x-rayed them, and they
25    were detonated.
```

JODY A. STEWART, Official Court Reporter

Cardwell, R. - Cross                                                        46

1    Q.  Okay.  And that, on the one that's at the near bottom of
2    the page, that looks like it's got some kind of a barcode on
3    it.  I assume, or do you know, was that put on there by the
4    investigators or was that barcode on there when it was --
5    A.  It was already on there.  That appears to just be a piece
6    of PVC pipe.
7    Q.  With maybe a what?
8    A.  Like the barcode from the store, is what it appears to
9    me.
10   Q.  From the store.  Okay.  Did you actually see these?
11   A.  I -- no, they made us exit the residence as soon as they
12   found them, for safety purposes.
13          MR. WOODWARD:  Okay.  All right.  You also, a
14   couple more things to go to, because we are covering
15   everything for both, Your Honor.
16   BY MR. WOODWARD:
17   Q.  You talked about Mr. Spafford trying to qualify as a
18   sniper.  What do you do to qualify?  What are you talking
19   about?  To qualify with who?
20   A.  So the range, the private range has qualifications for
21   the different ranges that they have, and one of the
22   qualifications is in order to go up from one yardage to
23   another yardage, you have to be able to qualify under their
24   statutes, which is basically like the rounds have to go
25   within a certain measurement from the bull's-eye, if that

Cardwell, R. - Cross                                                    47

1   makes sense.
2   Q.  Okay.  And you said when he was arrested he was
3   cooperative, he didn't have any weapons or contraband on him
4   or anything like that?
5   A.  He had a handgun inside the car.
6   Q.  But it was -- a legal handgun?
7   A.  It's a legal handgun.
8   Q.  Right.  And he was cooperative with you?
9   A.  He was cooperative with us.
10  Q.  Okay.  And his family was cooperative to you when you
11  showed up to do the search warrant?  I assume at that point
12  Mr. Spafford wasn't there, he was already in custody when the
13  search occurred?
14  A.  Correct.  He was in custody, and his wife was
15  cooperative.
16  Q.  Was at the home and was cooperative?
17        And did you search anywhere else?  Did you search any
18  of his workspace or any other locations, just his home?
19  A.  We did the residence, the vehicles, his phone, and all
20  the cartilage, the buildings, et cetera, that were on that
21  premise.
22  Q.  And you mentioned a little bit, I want to make sure the
23  Court understands.  You said there was a, I think you called
24  it a barn or a garage or was an outbuilding where the, what
25  you've said are explosive devices was found?

1    A.   So it was a double garage.  It had two double garage

2    doors on it.

3    Q.   Okay.

4    A.   And it was not attached to the primary residence.

5    Q.   Right.

6    A.   It was a lot of outbuildings on this property.

7    Q.   Okay.

8    A.   A little sheds, chicken coop, horse barn, the double

9    garage, and then an abandoned trailer in the back, what

10   appears to be an abandoned trailer in the back.

11   Q.   Okay.  So the 150 devices of which now nine remain that

12   haven't been detonated, where exactly were they found?

13   A.   So approximately 143 of them were found inside the actual

14   double garage.

15   Q.   Okay.

16   A.   The other six devices were found inside the residence in

17   the master bedroom.

18   Q.   Okay.  And the freezer that has the bottle in it that you

19   said you believe was HMTD, that was in that double garage as

20   well?

21   A.   Yes, sir.

22   Q.   Okay.  During the course of your investigation did you

23   receive any information that Mr. Spafford had ever threatened

24   any kind of harm to anybody?

25   A.   No.

Cardwell, R. - Cross                                                    49

1   Q.  Threatened any kind of harm to any organization?

2   A.  Not a direct threat, no.

3           MR. WOODWARD:  All right, Judge.  Thank you.

4   That's all the questions I have.

5           THE COURT:  Thank you.  I have just a couple.  Was

6   the garage used as a garage?  In other words, were there

7   automobiles in there, or was it used as a workshop, or what

8   was the nature of the garage?

9           THE WITNESS:  So there was no vehicles inside that

10  double garage space.  There was a variety of, like, shelving

11  and what appears to be partly like a workshop-type area.

12  You could have probably pulled in a vehicle, but they

13  were -- it appeared that they were still kind of moving and

14  unpacking some stuff.  It didn't look like it was exactly

15  set up a hundred percent yet.

16          THE COURT:  Was the garage locked?

17          THE WITNESS:  So when I was on scene, it was not

18  locked, and I -- the SWAT units are the ones that actually

19  entered that premise first.  There was no broken doors,

20  which would indicate to me that it was not locked, because

21  normally they would force entry, and it would be some kind

22  of damage to the door, but I have not received a specific

23  answer on that yet.

24          THE COURT:  All right.  Thank you.

25          Ms. Gantt, do you have any redirect?

1              MS. GANTT:  Yes, Your Honor.

2                      REDIRECT EXAMINATION

3    BY MS. GANTT:

4    Q.  You mentioned that you were provided access to the safe.

5    What did Mr. Spafford say about the keys to the safe?

6    A.  They were on top of the safe.

7              THE COURT:  I'm sorry, what?

8              THE WITNESS:  They were on top of the safe.

9    BY MS. GANTT:

10   Q.  And at the time you signed the affidavit in support of

11   the complaint, you did have photographs and wire recordings;

12   is that correct?

13   A.  Yes.

14   Q.  Mr. Woodward asked you about Mr. Spafford and

15   Mrs. Spafford being cooperative.  Is it fair to say that they

16   were, however, not truthful about the presence of explosive

17   materials?

18   A.  Correct.

19   Q.  And then, finally, during Mr. Spafford's interview, did

20   he ask to make a call to Mrs. Spafford?

21   A.  Yes, he did.

22   Q.  And was that call on speakerphone?

23   A.  Yes, it was.

24   Q.  And what did he state about his belief about the legal

25   jeopardy he was in?

```
 1    A.   These -- this is not his exact words, but he said
 2    something along the lines that he would be going away for a
 3    while.
 4             MS. GANTT:  Those are all my questions, Your Honor.
 5             THE COURT:  All right.  Thank you.  I did think of
 6    one other one.  You say the CHS is 20 years of law
 7    enforcement.  Do you know, did the CHS advise that the
 8    defendant was aware of the person's law enforcement status
 9    or former law enforcement status?
10             THE WITNESS:  Yes.  During their neighborhood
11    relationship, friend relationship, that individual was in a
12    marked police unit and often wore a uniform displaying his
13    badge of authority on his chest.
14             THE COURT:  All right.  Thank you.
15             MR. WOODWARD:  Your Honor, I thought of one more,
16    too.
17             THE COURT:  Well, I asked the question.  Go ahead,
18    Mr. Woodward.
19                     RECROSS-EXAMINATION
20    BY MR. WOODWARD:
21    Q.   Ma'am, the device or the implement that you testified you
22    believed was an improvised Claymore mine, was that one of the
23    devices that was exploded, or do you even know if it --
24    A.   I'm not sure.  I don't think they exploded that because
25    it wasn't put fully -- you have to put it all together, and
```

1   it was separated still.

2   Q.  Do you know if there was even any explosive with it?

3   A.  I don't know.  You'd have to ask the bomb techs.

4           MR. WOODWARD:  Okay.  Thank you, Judge.

5           MS. GANTT:  No, Your Honor.  Thank you.

6           THE COURT:  All right.  Thank you, Detective.  You

7   may step down.

8           THE WITNESS:  Thank you.

9           (Witness excused.)

10          THE COURT:  Well, the first thing the Court has to

11  determine is the question of probable cause.  Is there any

12  argument on that from either counsel?

13          MS. GANTT:  Not from me, Your Honor.

14          MR. WOODWARD:  No, Your Honor.

15          THE COURT:  All right.  Well, the charge in this

16  case is specifically possession of a firearm in violation of

17  the National Firearms Act.  The firearm at issue in this

18  case is alleged to be a short-barreled rifle.  I certainly

19  think probable cause has been established that the defendant

20  was in possession of such a firearm, and the evidence also

21  established that he did not have authority to do so, so,

22  therefore, I will find probable cause to support the charge,

23  but I suspect the more serious question for the parties, for

24  the Court to resolve, is the question of potential bond.

25          So let me go to you, Ms. Gantt.  I will take into

1    consideration everything that came out and the exhibits

2    during the examination of the detective, but is there any

3    further proffer or evidence you wish to offer on the

4    question of bond or detention?

5            MS. GANTT:  The only other thing I would offer,

6    Your Honor, is that the preliminary assessment of the FBI

7    explosive's lab in Quantico was that this is the largest

8    seizure of finished explosive devices by number in FBI

9    history.  That's all I would proffer in addition, Your

10   Honor.

11           THE COURT:  All right.  Mr. Swartz.

12           MR. SWARTZ:  Your Honor.

13           THE COURT:  Good afternoon.

14           MR. SWARTZ:  Good afternoon, sir.

15           THE COURT:  And do you have evidence, testimony, or

16   proffer you wish to make on the question of bond or

17   detention?

18           MR. SWARTZ:  Argument/proffer, Your Honor, if I

19   may.

20           THE COURT:  Well, I like to get all the facts out

21   first and then have argument.

22           MR. SWARTZ:  Well, the argument will be based on

23   the information in the pretrial report and also the evidence

24   of the testimony that was given this morning.

25           THE COURT:  All right.

```
1              MR. SWARTZ:  So argument.

2              THE COURT:  Well, it's the government's burden of

3     proof on the question of detention, so then I'll hear the

4     argument from Ms. Gantt first.

5              MR. SWARTZ:  Very good.

6              MS. GANTT:  Thank you, Your Honor.  Your Honor, the

7     government is relying on the risk to public safety, and it's

8     our burden by clear and convincing evidence.  Although there

9     is no rebuttable presumption here, all of the 3142 factors

10    weigh in favor of detention.

11             Starting with the nature and circumstances of the

12    offense charged, the current charge is a single count with a

13    penalty of up to ten years.  But there are numerous

14    potential additional charges for all of the destructive

15    devices, some of which were registered and all of which

16    would each carry an additional ten-year penalty.

17             As to the weight of the evidence, I think the

18    evidence is extremely strong for the existing charge in the

19    complaint.  They found the NSBR that matches what was shown

20    previously.  The defendant did not have it registered and

21    stated he did not believe in registration.

22             As to the history and characteristics of the

23    person, I think the family ties, employment, criminal

24    history are certainly all positive and weigh in favor of

25    Mr. Spafford, but they do not do much of anything to
```

1    mitigate what I would say is an extreme danger that he

2    poses.

3          He has the ability to manufacture and provide

4    explosive devices.  It's clear he -- we can see from the

5    notebook and all the manufacturing materials, the fuses, all

6    the different types of substances, that he has extensive

7    knowledge and skills and resources to make these devices and

8    has shown an extraordinary interest in doing so and

9    stockpiled quite a large number of them, over 150.

10         As was elicited in the testimony, Mr. Spafford has

11   never appeared to engage in violence, but he has certainly

12   expressed an interest in it, and I would say he has engaged

13   in reckless behavior regarding the safety of others.

14         After disfiguring his own hand, he still kept these

15   devices unsecured, with minor children living at the house,

16   including the apparent HMTD, which is a primary explosive

17   that requires nothing to be added and can explode simply by

18   friction, such as unscrewing the lid of a jar, kept those in

19   the freezer next to commonly used food items.

20         He certainly expressed no interest in complying

21   with rules regarding registration of any of these items, and

22   I think that shows an unwillingness to comply with pretrial

23   rules, as well as he and his wife's denial, repeated denial

24   of there being any explosive materials anywhere at the home.

25         That is my argument, Your Honor.  We would ask that

JODY A. STEWART, Official Court Reporter

1    he be detained.

2            THE COURT:  All right.  Thank you, Ms. Gantt.

3            All right, Mr. Swartz.  Now it's your turn.

4            MR. SWARTZ:  Thank you, Your Honor.  Your Honor,

5    Mr. Spafford is 36 years old.  He's lived here in this area

6    almost his entire life.  He graduated from high school at

7    Isle of Wight, obtaining an associate's degree, and then

8    came back here to live.  He's married with a wife and two

9    little girls.  They purchased their home that they currently

10   live in just a number of months ago.

11           He has been employed at the same company -- it was

12   mentioned during the testimony and also reflected in the

13   pretrial report -- at Collins Machine Works as a machinist.

14   He has been there for nine years at the same employment.

15           He has no criminal record, I think no history of

16   any previous criminal charges.  There is no presumption

17   against bond, and clearly this is about much more than the

18   charge for which the Court was required to find probable

19   cause this morning.

20           The testimony regarding the short-barreled illegal

21   gun was only a few minutes of a fairly lengthy and in-depth

22   hearing.  This was really a presentation by the government

23   to convince the Court that Mr. Spafford is a danger, and

24   that's what this morning was all about.

25           But what we know, the government, the task force

1   was receiving information, I believe according to the

2   detective, from approximately January of 2023, so almost two

3   years they have been getting information from a man who

4   Mr. Spafford knew was previously law enforcement.  So he

5   made lots of statements, many statements that I think many

6   people in our community might not agree with or might find

7   concerning, but what do we know?  What do we know from the

8   evidence presented and the testimony this morning?  He never

9   made any threats against any individuals.  He never made any

10  threats against any organizations.

11          Yes, we have been told this morning by the

12  government this is the largest seizure in FBI history, and

13  yet we don't know yet that that explosive was HMTD, and

14  what's more important, what do we also know?  In the two

15  years that they have been watching and gathering information

16  on Mr. Spafford, no allegation that anybody ever heard him

17  talk about detonating or distributing or employing those

18  devices in any way.  They found devices.  They detonated

19  most of them, they kept some of them, and we have to wait

20  for the reports to come back on that.

21          But, again, the government focuses on this

22  bomb-making endeavor that is the largest seizure in FBI

23  history, and, so, therefore, he's a danger to the community.

24  But, again, what do we know?  He's a family man who's lived

25  here in a home that he owns with his wife and his two

1    daughters.  He has no criminal record.  When he was
2    arrested, he was on his way to work on the job that he's had
3    for nine years.  He had a legal gun in his car.  He did not
4    try to flee.  He did not try to resist.  He did not try to
5    fight.  He was cooperative.  He answered questions.  He told
6    them apparently where they would found the key to the gun
7    safe where the guns in his home were properly secured and
8    safe.
9           So he cooperated with police.  The government
10   argues that there is evidence then that based on his past
11   conduct that he won't follow the rules of pretrial.  Now, I
12   understand that pretrial didn't hear all the information
13   about explosives and devices, but pretrial did find that he
14   was pretrial risk category one, which is associated with a
15   95 percent chance of successful compliance with any rules
16   implied by the Court.
17          This is a man who is a family man, who owns a home,
18   who has a fantastic job he's been at for nine years.  His
19   wife and other family members, including parents, are here
20   this morning and able and willing to serve as third-party
21   custodians.  The government has advised us the home has been
22   safe to return to for his wife and his daughters, and I
23   believe they've been able to return home.
24          So there is no presumption, and the government
25   says, well, he must be a danger because look what he's

1    engaged in.  Well, for two years he's been watched and

2    spoken with the entire law enforcement agent.  He's been

3    able to turn over this information.  Again, what have you

4    not heard today?  That Mr. Spafford has never met with

5    anybody else who shares any kind of anti-government

6    sentiments, that he's ever taken any action to plan any

7    future conduct.

8            When is all this supposed to happen?  They have

9    been watching him, gathering information on this man for two

10   years.  And what has he done during those two years?  He's

11   purchased a home.  He's raised his children.  He's in a

12   great marriage.  He has a fantastic job, and those things

13   all still exist for him.  And this Court can certainly

14   impose conditions to ensure that he will not engage in any

15   other activity that can be considered a danger.  Yes, it's

16   the biggest seizure in FBI history.  But what has this man

17   done to demonstrate that he's a danger?

18           He was injured and lost fingers in 2021, and, in

19   fact, as is reported in pretrial, he is still under the care

20   of doctors.  In fact, he had surgery in October, I think

21   which is reported, or November, and he has upcoming medical

22   appointments with -- at Johns Hopkins, which is where he

23   underwent this most recent surgery, because they are trying

24   to do a prosthesis to repair his thumb.

25           So he has been under medical care.  He had a recent

JODY A. STEWART, Official Court Reporter

1  medical procedure done.  He has additional future medical

2  appointments scheduled and contemplating future medical

3  procedures to continue to rebuild his hand, which was

4  injured a few years ago.

5          So he is certainly motivated in every sense

6  possible to comply with the rules of court so that he can

7  pursue medical care that he still requires, and to live

8  peacefully with his parents and with his family and to

9  assist us in the preparation for this case.

10          Again, he's charged with possession of a weapon.

11  Clearly, as we've all stated, and we all know this is about

12  much more than that, but that's what his charges, and there

13  is no presumption against bond.  He's found to be a category

14  one risk, and so he's a safe risk for bond.

15          Third-party custodians stand ready to assist their

16  family member and the Court in ensuring that he complies

17  with any conditions that are imposed by the Court to assure

18  his reappearance and the safety, and we believe that this

19  Court can impose conditions that will make him a safe person

20  to remain in this community while this case proceeds, and we

21  are asking the Court to set bond.

22          THE COURT:  All right.  Thank you, Mr. Swartz.

23          MR. WOODWARD:   Thank you, Judge.

24          THE COURT:  Well, the Court, as I always say, looks

25  at every case individually through the four factors of the

```
 1   Bail Reform Act.  The first factor for the Court to consider
 2   is the nature and circumstances of the offense.  The offense
 3   charged is possession of a short-barreled rifle without
 4   authorization.  But as Mr. Swartz has pointed out, this case
 5   appears to be about much more than that.
 6           So while what's been alleged in the criminal
 7   complaint, and the reason why Mr. Spafford was arrested, is
 8   because he possessed a firearm in violation of the National
 9   Firearms Act.  The underlying concern, it appears in this
10   case, is the nature of what the defendant might have
11   intended, not just in possession of that weapon but in
12   possession of what appeared to be a tremendous amount of
13   explosive devices, and there is an expressed inclination to
14   believe that violence is somehow the answer to what ails
15   this nation, apart from the notion that I'm always puzzled
16   by people who have such violent anti-government believes,
17   those are still First Amendment beliefs as long as they are
18   not acted on, and clearly the government is concerned,
19   however, that the defendant may be trying to put himself in
20   a position where he can act on those beliefs.
21           So while the nature and circumstances of the
22   offense itself are certainly not the most severe the Court
23   has ever seen, the potential for additional offenses has to
24   be taken into consideration.
25           Secondly, the weight of the evidence appears to be
```

1    quite substantial, largely stemming from the search warrant

2    that was executed that turned up all these explosives, and

3    certainly turned up evidence of the possession of a rifle

4    with too short a barrel.

5            With respect to the defendant's personal history

6    and characteristics, the defendant has a solid work history.

7    He has family support.  He's a lifelong resident.  He has

8    significant ties to this area.  He has children.  He's

9    married.  His parents are here.  So he has every reason not

10   to flee.  The government really hasn't argued that the

11   defendant is a risk of non-appearance.

12           But the question really is the risk, in the fourth

13   factor, posed to any other person or the community by the

14   defendant's release.  The question is always for the Court

15   whether there are circumstances the Court can fashion that

16   will reasonably assure the safety of any other person.

17           Nobody's really talked too much about what those

18   conditions might be, but the Court's been at this long

19   enough to be able to make those kinds of calculations and

20   evaluations itself by looking at what's available and

21   whether or not that is sufficient to mitigate any risk to

22   any other person or the community.

23           And certainly the risk posed to any other person or

24   the community is that, at least as the Court infers the

25   government's argument, is that the defendant might find

1     himself in a position for wanting to use these types of
2     devices against either political figures or anyone else he
3     thinks is responsible for whatever ills he things are going
4     on, but the question is can the Court fashion conditions?
5          The Court has a toolbox of conditions which it
6     relies on in cases that come before it, and while I have
7     this terrible concern that if I decide incorrectly, there
8     could be a significant problem down the road, there is no
9     presumption of detention, and the defendant has put forward
10    at least some conditions that might mitigate the risk, but
11    as I look at what conditions are available to me under the
12    statute, I believe additional conditions may provide the
13    reasonable assurance that any other person or the community
14    can be protected.
15         So I'm going to order the defendant's release, but
16    I'm going to order his release on a number of what I think
17    are sufficient but not greater than necessary conditions.
18    First of all, the defendant is going to be subject to a
19    $25,000 unsecured bond, and I'm going to appoint his mother
20    as his third-party custodian, who will be required to sign
21    off on that bond.  That bond is the defendant's written
22    guarantee that he will appear at all future court
23    proceedings, and he and the defendant's mother are advised
24    that if he fails to appear, or if he commits any offense
25    while on bond, that can subject the defendant to additional

1    penalties, including possible fine or imprisonment and the

2    forfeiture of up to $25,000.

3          I'm going to require that the defendant maintain

4    his residence with his mother, because I think that is

5    appropriate to keep the kind of sufficient eye, that he

6    won't be somewhere else on the property deciding that maybe

7    the problems of this world are such that his solution, or at

8    least his expressed desire to believe that violence is some

9    type of solution, at least that situation can be minimized.

10         So he will be required to maintain his employment.

11   I'm assuming his employment is still available, Mr. Swartz.

12   Is it?

13         MR. SWARTZ:  I understand that it is.  I spoke to

14   the owner of the company, Your Honor.

15         THE COURT:  All right.  He will be required to

16   maintain his employment.  His travel will be restricted to

17   the Eastern District of Virginia.  He needs to surrender

18   that passport that he has that's expired, if he hasn't

19   already, and he's not to apply for a new passport.  He's not

20   to have any contact with any victim, witness, or anyone else

21   involved in this case, and that includes the confidential

22   human source.

23         He's not to possess any firearm, destructive

24   device, or other dangerous weapons, and this is where the

25   importance of the third-party custodian comes into play.

```
1              Which one of you is the defendant's mother?

2              All right, ma'am.  I have appointed you as

3    third-party custodian.  That means you are responsible for

4    being basically the eyes and ears of the Court to make sure

5    your son adheres to these conditions that I'm imposing.  And

6    so I trust that you are willing to accept that

7    responsibility?

8              THE MOTHER:  Definitely, yes.

9              THE COURT:  All right.  Then any firearms?  The

10   bond report indicates that you are prepared to remove it if

11   you haven't already removed them from your home, but they

12   should be removed from your home.  I'm going to direct that

13   the defendant not use or unlawfully possess any drug or

14   controlled substance unless prescribed.  He's not to use

15   alcohol excessively.  He's to submit to random testing in a

16   manner required by probation.

17             I'm also going to require the use of electronic

18   monitoring in this case.  That will be -- the type of

19   monitoring will be determined by the probation office.  The

20   expenses will be paid by the defendant.

21             Mr. Swartz, what are the defendant's work hours?

22             MR. SWARTZ:  Usually he works second shift, which

23   is 3:00 p.m. to 11:00 p.m.

24             THE COURT:  All right.

25             MR. SWARTZ:  That's subject to change, but that is
```

1    his regular work schedule.

2         THE COURT:  All right.  So I'm going to impose the

3    condition of home detention, which means the defendant is

4    restricted to his residence at all times except for

5    employment, education, religious, medical, substance abuse,

6    mental health treatment, attorney visits, court or other

7    activities approved in advance by the probation officer.

8         Now, the probation office will be setting up the

9    monitoring and will have the right to perform home

10   inspections, either announced or unannounced, to make sure

11   that the defendant is adhering to these conditions.

12        I impose these conditions, Mr. Spafford, with the

13   understanding that you understand these aren't suggestions

14   or these aren't inclinations that you may or may not decide

15   to adhere to.  They are, in fact, conditions, and your

16   adherence to those conditions is what will keep you from

17   being detained in the future.

18        So those are the conditions I'm going to impose.

19        Ms. Gantt, does the government think any other

20   conditions are necessary?

21        MS. GANTT:  No, Your Honor.  But we would note an

22   appeal of the decision and ask a release order be stayed

23   until the appeal is determined.

24        THE COURT:  Well, I'll tell you what I'll do,

25   Ms. Gantt.  You can file that by the end of today.  If you

1    file it by the end of today, then the release decision will
2    be stayed until it's resolved by a District Judge.  But I
3    want to make sure that you understand that this matter
4    should be expedited.
5         The defendant has already been in custody for a
6    while, and I've been doing this a long time, and the only
7    time I ever made the wrong decision, it was someone who fled
8    the country.  I don't think that's a significant risk with
9    respect to this defendant, but I do respect your position.
10        I do understand the government's concerns, but I do
11   acknowledge, as part of the basis for my decision, you know,
12   it's almost a catch 22, that the government's been aware of
13   this potential risk since January of '23, and on the one
14   hand it's been almost two years since they finally acted on
15   it.  On the other hand, there is always the criticism that
16   the government acted too soon, and so I do appreciate the
17   sort of Hobson's choice you had there.
18        But in this case I do think that there are
19   conditions that can be fashioned, as I've expressed.  So get
20   some on file this afternoon, and the District Judge, whoever
21   gets assigned to it, I will reach out to them and let them
22   know that they should give this their prompt attention.
23        MS. GANTT:  Thank you, Your Honor.  And I'll order
24   the transcript as soon as I return.
25        THE COURT:  Thank you, Ms. Gantt.

1           All right, Mr. Swartz or Mr. Woodward, is there
2    anything further for the Court to address?
3           MR. WOODWARD:  Only, Your Honor, that when the
4    government orders the transcript, we would like a quick
5    expedited copy as well.
6           THE COURT:  We don't have a reporter in here today
7    so it's by FTR, and so, therefore, we will do our best to
8    get that promptly.
9           MR. WOODWARD:  I understand, Your Honor.  Thank
10   you.
11          THE COURT:  Just one question on the possession of
12   the weapons.
13          THE PROBATION OFFICER:  Did you want the condition
14   that probation having reviewed ammunition and magazines?
15   Did you want --
16          THE COURT:  Yes.  We are -- nothing dangerous.
17          THE PROBATION OFFICER:  Okay.
18          THE COURT:  Thank you, everyone.
19          The Court stands in recess.
20          MR. WOODWARD:  Thank you, Your Honor.
21          (Hearing adjourned at 12:29 p.m.)
22
23
24
25

1                          CERTIFICATION

2

3          I certify that the foregoing is a correct

4   transcript, to the best of my ability, of the court's audio

5   recording of proceedings in the above-entitled matter.

6

7          X_____/s/_____x

8                      Jody A. Stewart

9              X_____1-2-2025 _____x

10                        Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JODY A. STEWART, Official Court Reporter